# EXHIBIT A

Eric P. Lee (USB 4870)
Justin J. Keys (USB 13774)
JONES WALDO HOLBROOK & McDONOUGH, PC
1441 West Ute Blvd., Suite 330
Park City, Utah 84098
Telephone: (435) 200-0085
elee@joneswaldo.com
jkeys@joneswaldo.com

*Attorneys for Plaintiffs MedRepPro, LLC and Scott Carson*

## IN THE THIRD JUDICIAL DISTRICT COURT OF SUMMIT COUNTY
## STATE OF UTAH

| | |
|---|---|
| MEDREPPRO, LLC; SCOTT PATRICK CARSON,<br><br>    Plaintiffs,<br>vs.<br><br>ALMA LASERS, INC.; JASON MCCLAIN; and DAVID MANNING,<br><br>    Defendants. | **COMPLAINT**<br><br>Case No. 170500232<br><br>Judge Kara Petit |

Plaintiffs MedRepPro, LLC ("MedRepPro") and Scott Patrick Carson (together "Plaintiffs") complain of Defendants Alma Lasers, Inc. ("Alma Lasers"), Jason McClain, and David Manning as follows:

### Parties, Jurisdiction, and Venue

1. MedRepPro is a Utah Limited Liability Company with its principal place of business in Park City, Utah. Scott Carson is MedRepPro's only member and manager.

2. Scott Patrick Carson is an individual residing in Park City, Utah.

3. Alma Lasers is an Illinois corporation with its principal place of business in Buffalo Grove, Illinois.

4. Jason McClain is an individual who resides in Tennessee.

5. David Manning is an individual who resides in Georgia.

6. The Court has jurisdiction of this action under Utah Code § 78A-5-102(1). Venue in this Court is proper under Utah Code § 78B-3-306.

## BACKGROUND

7. The allegations in all preceding paragraphs are hereby incorporated by reference.

8. MedRepPro is a purchaser and distributor of medical laser systems.

9. Alma Lasers is a manufacturer and distributor of medical laser systems.

10. Jason McClain is a Direct Sales Representative[1] for Alma Lasers.

11. David Manning is a regional sales manager for Alma Lasers.

12. MedRepPro and Alma Lasers share a client base: purchasers of medical laser systems.

13. Medical laser systems are specialized devices and are utilized primarily by physicians.

14. Physicians using medical laser systems represent a small segment of the population, consisting of highly-educated physicians who use these systems as a part of their specialized practices.

15. Plaintiffs and Alma Lasers both make their offerings to these physicians and their practices.

16. While Alma Lasers exclusively sells newly manufactured medical laser systems, Plaintiffs currently focus on the re-sale of used medical laser systems.

17. Plaintiffs also refer clients who are in need of new medical laser systems to manufacturers such as Alma Lasers.

18. Indeed, in April 2015 Alma Lasers made Plaintiffs an authorized distributor of Alma Lasers products.

---

[1] The terms "Direct Sales Representative" is defined below.

19. The parties have entered into multiple written agreements setting out the terms of their distributorship and referral relationship. The parties' September 11, 2015 "Referral Agreement" is still in effect and expires on its own terms June 30, 2017.

20. Alma Lasers also works—with the knowledge and support of Alma Laser's leadership—with Plaintiffs to re-market used Alma Laser systems.

21. When Alma Lasers sells a new medical laser system, it often facilitates Plaintiffs' purchase of the customer's used or existing medical laser system. Plaintiffs' purchase of this equipment allows Alma Lasers to make a sale because it gives the customer a chance to recover value from its existing equipment.

22. Plaintiffs and Alma Lasers have engaged in this symbiotic business relationship for at least two years.

23. During that time, Alma Lasers and its representatives have facilitated Plaintiffs' purchase of hundreds of thousands of dollars of used medical laser systems. These systems are shipped to Plaintiffs' offices in Park City, Utah to be refurbished and re-sold.

24. Plaintiffs are in nearly daily telephone, text, or email contact with Alma Lasers' representatives regarding these deals. Plaintiffs have also met with Alma Lasers' representatives at trade shows around the country and several representatives of Alma Lasers have visited Plaintiffs in their Utah offices. Alma Lasers' leadership also came to Plaintiffs' Utah offices to finalize the parties' original distributorship agreement.

25. Yet despite this cooperative agreement, Plaintiffs and Alma Lasers continue to compete for the attention of the same market.

26. In the course of this competition, Plaintiffs were made aware that representatives of Alma Lasers were making false and derogatory statements about Carson and Plaintiffs' business to advance Alma Lasers' competitive position.

27. Several representatives of Alma Lasers confided in Plaintiffs that this is Alma Lasers' pattern of conduct, and that Alma Lasers is willing to make any statement, regardless of its veracity, to make a sale.

28. Plaintiffs were also informed that several individuals within the upper-management of Alma Lasers frequently derided Plaintiffs in internal sales meetings at Alma Lasers.

29. While Plaintiffs were concerned that Alma Lasers may be making derogatory or defamatory statements about them, they continued to operate in good faith with the hope that these defamatory statements were not being passed on to clients or potential clients.

## MAY 2017 STATEMENTS

30. In late April to early May 2017, Plaintiffs negotiated the sale of a 2014 Alma Pixel CO2 Laser FemiLift Fractional Vaginal Resurfacing CO2 Femi Lift laser to a Dr. Alberto Cadena.

31. Dr. Cadena responded to an advertisement MedRepPro had placed for the medical laser system and Dr. Cadena requested that MedRepPro send him a purchase agreement.

32. After Plaintiffs sent the purchase agreement to Dr. Cadena to finalize the sale, Dr. Cadena forwarded to them the substance of an email he received from Alma Lasers discussing Plaintiffs and their products.

33. That email states:

> You are getting ZERO bang for your buck with the used system because you can't get any disposable sheaths for you patients! What are you going to do after your 5th patient? Alma does not sell the sheaths to ANYONE other than current Alma customers, I don't care what Carson or any other dealer for that matter is telling you.
>
> Alma does not service any system that is being sold by a 3rd party vendor without a recertification fee ($35,000). There is no way for us to know exactly what has been done to the system after being sold to the dealer, stripped for parts, unauthorized tweaking or repairs, etc. What are you going to do when the system needs to be serviced? I don't care if he gives you a 10 year warranty instead of a 90 day warranty, in the event something needs to be serviced, Alma won't be doing the repair work without a recertification fee. If ANYTHING happens to a

4

patient with a device that isn't under FDA guidelines (and any repair from anyone other than the manufacturer is a direct violation), you are in serious legal trouble.

Who is going to do your repair work with a used system? Carson himself? You will be stuck with a system that doesn't work. This is why he has been sued so many times. Here is his cycle of fraud: He will open up a new business, sell a piece of equipment with "90 day warranty" and promise supplies, the system will break or the customer won't be able to get supplies, he leaves the customer high and dry, they sue him, he closes shop, creates a new business entity, and then the process repeats over and over again. This has been going on for years and years. Do you [sic] own research on this guy. Also feel free to reach out directly to my boss, who I have attached to this email. He will speak directly to this and can answer any questions you may have.

I am giving you full warranty, full clinical training, the full system with non-ablative handpiece, marketing, patient finder on our website, and ability to buy patient supplies moving forward!! I can even give you the option of choosing which probe you want, classic vs slim.

$65,000. I can get you great financing terms, lease or loan options with. I've already sent his info over to you.

You know that the best business decision will be to go with and it's not close. The $10,000 you think you will be saving is a mirage, it will cost you so much more money moving forward.

Let's get you making some serious money now! The longer you wait, the more patients are going to your competition.

Please call/email/text me your decision this week. I look forward to partnering with you.

34. This email was sent by Alma Lasers' Direct Sales Representative Jason McClain on or about May 4, 2017, and the "boss" that Dr. Cadena is encouraged to contact to discuss Carson's "cycle of fraud" is David Manning. Manning is a Regional Sales Supervisor for Alma Lasers.

35. Ironically, the same day that McClain sent this email, Manning exchanged several text messages with Carson facilitating a purchase of used equipment by Plaintiffs from a customer of Alma Lasers. Manning understood that this equipment would be shipped to Plaintiffs' Utah headquarters to be refurbished and re-sold.

36. After receiving the defamatory email, Dr. Cadena cut off contact with Plaintiffs and failed to sign the purchase agreement he had previously negotiated with Plaintiffs.

37. From that lost sale alone, Plaintiffs stood to make $45,000. This is not to mention any future sales Plaintiffs will not garner from Dr. Cadena or any other potential customer to whom he relays Alma Lasers' false statements regarding Plaintiffs' supposed "cycle of fraud."

## REFUSAL TO WITHDRAW DEFAMATORY STATEMENTS

38. After receiving the May 4 email from Dr. Cadena, Plaintiffs demanded that Alma Lasers retract their defamatory statements and right the harm they caused.

39. But instead of retracting the defamatory statements or taking any steps to make Plaintiffs whole, Alma Lasers instructed all of its sales representatives—throughout the United States—to no longer communicate with Plaintiffs. This instruction effectively prohibits all Alma Laser representatives from doing any work with Plaintiffs.

40. This instruction was given to both Direct Sales Representatives and Indirect Sales Representatives.

41. Direct Sales Representatives of Alma Lasers are those who distribute only Alma Lasers' products.

42. Indirect Sales Representatives are independent distributors authorized to distribute Alma Lasers' products but who also represent and distribute products for other manufacturers of medical laser systems.

43. As a result of Alma Lasers' instruction to its sales representatives, Plaintiffs are prevented from doing work even with Indirect Sales Representatives because those representatives are fearful of losing their distributorship agreement with Alma Lasers.

44. Alma Lasers' conduct amounts to an attempt to completely freeze Plaintiffs out of the medical laser system market.

6

45. This is a continuation and culmination of the same pattern of tortious business practices Alma Lasers has perpetuated for several years.

### First Cause of Action
(Defamation)

46. The allegations in all preceding paragraphs are hereby incorporated by reference.

47. In late April to early May 2017, Plaintiffs were competing with Alma Lasers for a sale to Dr. Cadena.

48. On or about May 4, 2017, Alma Lasers' sales representative Jason McClain sent an email to Dr. Cadena regarding Mr. Carson stating, in relevant part:

> I don't care if [Carson] gives you a 10 year warranty instead of a 90 day warranty, in the event something needs to be serviced, Alma won't be doing to the repair work without a recertification fee. If ANYTHING happens to a patient with a device that isn't under FDA guidelines (and any repair from anyone other than the manufacturer is a direct violation), you are in serious legal trouble.
>
> Who is going to do your repair work with a used system? Carson himself? You will be stuck with a system that doesn't work. *This is why he has been sued so many times. Here is his cycle of fraud: He will open up a new business, sell a piece of equipment with "90 day warranty" and promise supplies, the system will break or the customer won't be able to get supplies, he leaves the customer high and dry, they sue him, he closes shop, creates a new business entity, and then the process repeats over and over again. This has been going on for years and years.* Do you [sic] own research on this guy. Also feel free to reach out directly to my boss, who I have attached to this email. He will speak directly to this and can answer any questions you may have.

49. This published statement was made in print to a third party—Dr. Cadena.

50. The statement is false.

51. Plaintiffs do warrant all of their products and provide necessary supplies.

52. But more importantly, Plaintiffs are not engaged in a "cycle of fraud" that "has been going on for years and years."

7

53. Rather, Plaintiffs are engaged in a legitimate business that is supported behind the scenes by Alma Lasers, who in part supplies Plaintiffs with the very used medical laser systems Plaintiffs re-sale. Plaintiffs have engaged with Alma Lasers in this very business for more than two years.

54. Further, a review of the major outlets through which Plaintiffs advertise their products demonstrates that they have an excellent sales and review rating. If Plaintiffs were leaving clients "high and dry," those clients would not be providing stellar positive feedback.

55. Carson has never intentionally closed a business to avoid a lawsuit over the quality of his products, warranty issues, or a lack of product supplies. This is an outright fabrication.

56. When Alma Lasers made these statements to Dr. Cadena, no Alma Lasers representative was a patient of Dr. Cadena, nor were the statements subject to any other privilege. Indeed Dr. Cadena shared Alma Laser's communication with Plaintiffs shortly after he received it.

57. At a minimum, Alma Lasers' representatives made these statements negligently, in breach of their duty to refrain from making false statements about Plaintiffs that will cause them damage.

58. But worse, Alma Lasers made these statements in the context of competing for a contract with Dr. Cadena and—given their intimate knowledge of the legitimacy of Plaintiffs' business—made the statements with knowledge of their falsity and the harm the statements would cause Plaintiffs. At a minimum, Alma Lasers acted with reckless disregard for the truth of the statements made.

59. The actual malice behind the statements is demonstrated by the content of the statement. Alma Lasers accuses Carson of perpetuating a "cycle of fraud" relating to the business that Alma Lasers and Carson both operate. Alma Lasers sought to gain a competitive advantage by (falsely) accusing Carson of fraudulent and illegal behavior.

60. Alma Lasers' statements are defamatory per se because they charge Carson (and by implication MedRepPro) with both criminal conduct and conduct that is incompatible with the exercise of a lawful business, trade, and profession.

61. The damage Plaintiffs have suffered is apparent from the words offered. Alma Lasers labeled Plaintiffs as a fraud out to deceive and defraud potential clients such as Dr. Cadena. As a result, Dr. Cadena refused to complete his purchase of the 2014 Alma Pixel CO2 Laser FemiLift Fractional Vaginal Resurfacing CO2 Femi Lift laser.

62. But the damage extends far beyond that sale. Anyone with whom Dr. Cadena interacts—in what is a tight-knit professional industry—may hear the same false defamatory statements. The perpetuation of these false statements will cause Plaintiffs to lose additional sales.

63. As a result of Alma Lasers' defamatory statements, Plaintiffs have suffered and are entitled to recover, general, compensatory, actual, and consequential damages, all in amounts to be determined at trial, which amount exceeds $300,000, together with interest at the maximum rate permitted by law.

64. In engaging in the conduct alleged herein, Alma Lasers acted willfully, oppressively, in bad faith, with malice, and with reckless indifference or disregard of the right of Plaintiffs, thereby entitling Plaintiffs to recover punitive damages in accordance with Utah Code § 78B-8-201, in an amount to be determined at trial, which amounts exceeds $300,000, together with interest at the maximum rate permitted by law.

### Second Cause of Action
(False Light)

65. The allegations in all preceding paragraphs are hereby incorporated by reference.

66. By sending the May 4, 2017 email, Alma Lasers publicized a matter concerning Plaintiffs that placed the Plaintiffs before the public in a false light.

67. That email placed Plaintiffs in a false light by asserting that Carson was engaged in a "cycle of fraud" and by intimating that Plaintiffs' proposed sale to Dr. Cadena was part and parcel of this fraud.

68. Alma Lasers' statements portray Plaintiffs as fraudsters out to swindle innocent purchasers such as Dr. Cadena of their hard-earned money leaving them "high and dry."

69. Alma Lasers either knew these statements to be false or acted in reckless disregard to their truth because they have been engaged in a symbiotic business relationship with Plaintiffs for more than two years, even providing Plaintiffs many of the medical laser systems Plaintiffs re-sale.

70. These statements placed Plaintiffs in a false light that would be highly offensive to a reasonable person because the statements directly attack Plaintiffs integrity as it relates to their own business or profession. They also accuse Plaintiffs of fraud and fraudulent behavior, which is contrary to the general ethos of society.

71. As a result of Alma Lasers' tortious actions, Plaintiffs have suffered and are entitled to recover, general, compensatory, actual, and consequential damages, all in amounts to be determined at trial, which amount exceeds $300,000, together with interest at the maximum rate permitted by law.

**Third Cause of Action**
(Intentional Interference with Economic Relations)

72. The allegations in all preceding paragraphs are hereby incorporated by reference.

73. Alma Lasers interfered with Plaintiffs' existing and potential economic relations with Dr. Cadena by sending the false and defamatory statements included in the May 4 email.

74. The May 4 email is a single manifestation of a pattern of conduct whereby Alma Lasers interferes with Plaintiffs' economic relations when it serves its interest.

75. Alma Lasers also interfered with Alma Lasers by instructing all of its Direct and Indirect Sales Representatives nation-wide to no longer contact or do business with Plaintiffs.

76. This interference came after Plaintiffs warned Alma Lasers of the falsity of the statements made and requested that Alma Lasers remedy the harm it had caused.

77. Alma Lasers' interference was all made by an improper means because it is based on defamatory statements that cast Plaintiffs in a false light.

78. As a result of Alma Lasers' tortious actions, Plaintiffs have suffered and are entitled to recover, general, compensatory, actual, and consequential damages, all in amounts to be determined at trial, which amount exceeds $300,000, together with interest at the maximum rate permitted by law.

### Fourth Cause of Action
(Permanent Injunction)

79. The allegations in all preceding paragraphs are hereby incorporated by reference.

80. Plaintiffs seek a permanent injunction against Alma Lasers preventing it from making false and defamatory statements regarding Plaintiffs similar to those made in the May 4 email.

81. Plaintiffs have been damaged by Alma Lasers' false statements.

82. Plaintiffs have a protectable property interest in their professional reputation and goodwill.

83. Legal remedies are inadequate to prevent the ongoing and continuing harm that Alma Lasers' false statements have caused, are causing, and will yet cause to Plaintiffs.

84. Plaintiffs will suffer irreparable harm to their business reputation with current and prospective customers if Alma Lasers continues to make such false and defamatory statements and does not retract the statements already made.

85. The permanent injunction Plaintiffs seek can be enforced.

86. The balance of equities weighs in favor of granting a permanent injunction.

87.

**Prayer for Relief**

WHEREFORE, Plaintiffs request relief as follows:

A. On its first cause of action, for a monetary award of compensatory damages and punitive damages, all in the amounts to be established by the Court or a jury at trial, plus post judgment interest at the highest rate allowed by law.

B. On its second cause of action, for a monetary award of compensatory damages and punitive damages, all in the amounts to be established by the Court or a jury at trial, plus post judgment interest at the highest rate allowed by law.

C. On its third cause of action, for a monetary award of compensatory damages and punitive damages, all in the amounts to be established by the Court or a jury at trial, plus post judgment interest at the highest rate allowed by law.

D. On its fourth cause of action, for an order from the Court enjoining Defendants to retract the defamatory statements made in the May 4 email and ordering them to forever refrain from making similar defamatory remarks regarding Plaintiffs.

E. For such additional relief as the Court deems just and appropriate in the circumstances.

Dated this ___ day of May, 2017.

JONES WALDO HOLBROOK & MCDONOUGH, PC

_____/s/ Justin J. Keys_____
Eric P. Lee
Justin J. Keys
*Attorneys for Plaintiffs MedRepPro, LLC and Scott Carson*

Plaintiff's Address:
2585 Aspen Springs Drive
Park City, Utah 84060